[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff wife, 27, a U.S.A. citizen, and the defendant husband, a citizen of India, were married in India on December 29, 1991, in the Hindu religion and custom as a result of an arranged marriage, a common practice in such culture.
The parties were introduced through family members in late November 1991. The plaintiff described her education, that she had just taken the C.P.A. exam, that she desired to complete a Master's in Taxation, and that after completing two years of accounting experience required for the C.P.A. license, she would then be prepared to stay home to raise their children. It is Hindu custom for the husband to provide for his wife and family.
The defendant, a medical doctor, was working in a surgery residency in India. He intended to take Kaplan Review — classes in order to successfully pass the U.S. requirement to practice medicine in the U.S.A. To do this, it was understood by the parties that while he took these Kaplan courses, they would live with the plaintiff's parents and the plaintiff would continue working. CT Page 10020
After the wedding, the parties resided with the defendant's family until January 23, 1993, when the plaintiff returned to the U.S.A. During these three weeks, the marriage was consummated. Most of their time was spent visiting his relatives or receiving visitors who came to meet the new bride. Such activities are inconsistent with the plaintiff's claim that the defendant never had any intention of being a husband. The essentials of a marriage were displayed during this time. The plaintiff then submitted a Petition for Alien Relative, dated January 10, 1992 (Plaintiff's Exhibit A) to the U.S. Department of Justice, Immigration and Naturalization Service (INS). The initial conditional visa was issued to the defendant and he arrived in the U.S.A. on August 1, 1992, at New York City, where the plaintiff met him, bringing him to her parents' home in Naugatuck.
Three days later, the defendant told his father-in-law he wished to move to New Jersey or Mississippi. The next day, her father told the plaintiff. The plaintiff asked the defendant who said he had a friend in New Jersey and a sister living in Mississippi. The plaintiff attempted to reassure the defendant that everything is different in the U.S.A.
The following week, the defendant's sister and brother-in-law came from Mississippi to Naugatuck to visit. Again, the topic of moving arose. The defendant was told that he was welcome to move, but not without bringing his wife.
Next, the defendant contacted a cousin of the plaintiff's who worked in Manchester, Connecticut. The plaintiff's father paid the $2,320 for course study at Kaplan (Defendant's Exhibit #1) on August 19, 1992. The defendant complained to the cousin that he was not getting along with the plaintiff's father, without giving any specific problems. The plaintiff's father and the defendant spent 6 p.m. to 8 p.m. together in the home. The plaintiff's father was also teaching the defendant how to drive an auto on the right side of the road. To solve the defendant's friction with the plaintiff's father, the cousin offered living quarters rent free in an investment house he had bought, to be paid back after the defendant started to practice medicine. No proposal was acceptable to the defendant, .although several were made to him by the plaintiff and her cousin during the Labor Day weekend.
On Labor Day evening, the defendant announced that he was CT Page 10021 leaving on Wednesday, September 9, for his sister's in Mississippi, and that the plaintiff could stay with her parents. The defendant planned to have his Kaplan classes transferred to Mississippi. The plaintiff never saw the defendant again, although he visited Connecticut on two occasions.
The plaintiff has described the Hindu culture which expects the marriage, although arranged, to last. A failed marriage is always blamed on the female, who is subservient to the male, who always is older than his bride. The involvement of both families in the introduction, the engagement, the marriage and subsequent assistance are all elements of the Hindu cultures design for a successful marriage.
The defendant had been exploring the feasibility of obtaining a visa to enter the U.S.A. as a student for the Kaplan classes. The plaintiff claimed he was having a difficult time pursuing that route, but evidence was produced to corroborate the claim the defendant told the plaintiff he had applied for the visa and to Kaplan (Defendant's Exhibit #1). From the said exhibit, it appears from the I.N.S. affidavit of support sworn to by the defendant's brother-in-law, together with the attached bank letters that the legal requisites for student tuition expense and living expenses would be underwritten by the defendant's sister and brother-in-law.
The defendant's claims that the marriage broke down because he had an inconvenient access to the shower, that he was asked to remove the hair from the shower drain when he finished, that the plaintiff's family used frozen food and a microwave, and that his study was difficult in the plaintiff's family home all appear to be trivial reasons seized upon by the defendant to extricate himself from his marriage. Although his sister made it clear to the defendant that he was welcome, as long as his wife was with him, he did not ask the plaintiff to leave with him, nor did she ask to go.
Although the defendant had no money and no income, he declined the offer of separate living quarters from the plaintiff's cousin, a solution that appeared to meet his complaints about his in-laws' home and habits.
Although the defendant testified he attempted to reconcile with the plaintiff, the court finds no evidence to support these claims. On the contrary, the flimsiest of reasons formed the CT Page 10022 foundation for his departure. The plaintiff's letters and cards to the defendant show her efforts to be a wife, but there is no letter from the defendant in evidence until one dated December 29, 1993, wishing her "Merry Christmas" and "Happy New Year" and then agreeing to the proposed financial settlement and inquiring about his medical insurance card for coverage paid for by the plaintiff. Why the defendant, a Hindu, wished the plaintiff, a Hindu, Merry Christmas is never explained in the record. At the least, it appears to be inappropriate.
After reviewing the evidence, the court cannot exclude the simple fact that the defendant changed his mind about the future of the marriage, since his wife was working and attending school, that he was uncomfortable about the living arrangements and he was totally dependent upon the plaintiff's family. This prevents the court from finding for the plaintiff by clear and convincing evidence
The plaintiff is proceeding pursuant to Sec. 46b-40 C.G.S.:
 "(b) An amendment shall be granted if the marriage is void or voidable under the laws of this state or of the state in which the marriage was performed."
The defendant relies heavily on a 1949 Superior Court decision, Avery v. Avery, 6 Conn. Sup. 418, for the proposition that unless there is some evidence that before the marriage the husband did not intend to fulfill his promise, the wife is not entitled to an annulment. That, again goes on to say at p. 419:
 ". . . . it is extremely doubtful that, under our law, any marriage is made voidable by reason of a fraudulent representation of any nature."
No subsequent citation is found in Shepard's Conn. Citations for this case.
The Avery case does cite Davis v. Davis, 119 Conn. 194
(1934), which applied New York law to declare a marriage void where one Connecticut teenager (19 at the time) while on an auto ride, dared that plaintiff (also 19) to marry her. He accepted the dare, a license was obtained and a justice of the peace performed the ceremony. The marriage was never consummated. Since neither party had the requisite intention, the marriage, under New York law, was decreed void. CT Page 10023
Kurys v. Kurys, 25 Conn. Sup. 495 (1965) cites the general propositions at p. 497:
 A marriage entered into in good faith which is bona fide is not illegal even though made with the express purpose "to avoid deportation." Cirullo v. Licata, 10 N.J. Super. 449, 452. However, where the parties married merely to permit an alien to remain in the United States under an agreement between themselves that they would not live together and a divorce would be secured within six months, mutual consent was lacking and there was not a valid marriage. United States v. Rubenstein, 151 F.2d 915 (2d Cir.), cert. denied, Rubenstein v. United States, 326 U.S. 766; see Davis v. Davis, 119 Conn. 194. So, if an alien marries a citizen of this country for the only purpose of entering the United States, and without any intention of assuming the duties and responsibilities of the marriage, in a proper case an annulment may be decreed. Damaskinos v. Damaskinos, 325 Mass. 217; 55 C.J.S., Marriage, § 34(b).
 Fattibene v. Fattibene, 183 Conn. 433 (1981) involved a counterclaim seeking an annulment based on the plaintiff's alleged fraudulent nondisclosure. The case applied Washington, D.C. law since the parties were married there. The court discusses the difference between accidental qualities of the other party as opposed to the essential and material elements on which the marriage relation exists. Cited are Gordon v. Gordon,11 Conn. Sup. 302 (1942), which involved the non-disclosure of a prior criminal record and four minor children that the husband had fathered and was boarding out; and Fournier v. Fournier,14 Conn. Sup. 171 (1946) which involved the non-disclosure of the wife's prior marriage to a man she believed had since died. Her belief was never disproven. In both cases, such circumstances did not operate to prevent or frustrate some essential purpose of marriage, Fattibene, supra, p. 440. Proof by clear and convincing evidence is necessary to establish fraud under D.C. law to void a voidable marriage.
Bernstein v. Bernstein, 25 Conn. Sup. 239 at 241 points out that entry into marriage gives rise to a presumption that the parties intend to enter into a formal marital relationship. This includes cohabitation and all the obligations, duties and CT Page 10024 responsibilities that go with a normal marriage. The plaintiff in the present case cannot demonstrate that the defendant did not intend to assume the responsibilities of marriage either at the time of or for several months after the wedding. Discord arose only after the defendant arrived in Naugatuck.
The court concludes that the cultural shock of frozen food, microwave cooking, lack of household help, and a general difference of culture put great burden on this marriage. It is not sufficiently clear that the defendant entered into this marriage solely to gain access to the U.S.A. via a visa as an alien relative. Since clear and convincing evidence is necessary to prove fraudulent misrepresentation, the court concludes that the plaintiff's evidence falls short. The plaintiff's complaint for annulment is denied.
There is no question but that the marriage irretrievably broke down shortly after the defendant left Naugatuck.
A decree is entered on the cross complaint dissolving the marriage on the ground alleged. The defendant is ordered to pay $4,500. to the plaintiff at the rate of $250. monthly. He is to receive credit for any payments made since the date of trial, June 24, 1994. The first payment is due on October 1, 1994. The court orders restoration of the plaintiff's maiden name, Patel.
Counsel for the defendant is directed to draft the judgment file.
HARRIGAN, J.