Filed 12/22/20  Marriage of Salehi and Sakhizada CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re the Marriage of SAMREEN SALEHI and SHOEIB SAKHIZADA. | C087959 |
| SAMREEN SALEHI,<br><br>Respondent,<br><br>v.<br><br>SHOEIB SAKHIZADA,<br><br>Appellant. | (Super. Ct. No. STAFLNWOC20170004761) |

M. Shoeib Sakhizada (appellant) appeals from a judgment annulling his marriage to Samreen Salehi (respondent) on the ground that respondent's consent to the marriage was obtained by his fraud (Fam. Code, § 2210, subd. (d)).  Appellant contends on appeal the judgment is not supported by substantial evidence.  We disagree and affirm.

## I.  BACKGROUND

In August 2016, following their families' agreement, appellant and respondent met at a Starbucks and began getting to know each other.  Appellant was from London; he told respondent he was in the United States on a work visa, but the job he came to do did

1

not work out.  Respondent had a "stable job" here in the United States; she wanted to get married and settle down.  Appellant indicated that he too wanted to marry and settle down.  With their families' consent, appellant and respondent became engaged.

Shortly after their agreement to become engaged, appellant told respondent his visa was expiring.  He and his family said a civil ceremony would have to take place immediately so that appellant could remain in the country.  Respondent felt rushed, she wished appellant had told her about his visa situation when they first met.  Nevertheless, appellant and his family had agreed to a religious wedding, so she acquiesced to the civil ceremony, and, in September 2016, the parties were married in the San Joaquin County courthouse.

Following the civil ceremony, appellant's uncle took appellant and respondent to his friend, a lawyer in Oakland, who advised the parties to prepare for their immigration interview.  He told appellant and respondent they needed to live together and share a bank account.  Respondent told the lawyer they were unable to live together because they had not been "religiously married."  This was news to the lawyer.  Respondent did, however, open a joint bank account for herself and appellant.

Along with their families, the parties continued to talk about the religious/cultural wedding.  They agreed they would plan the wedding after appellant got his green card, which he applied for after the civil ceremony.  Consistent with their traditions, on November 26, 2016, respondent's family hosted the parties' "cultural engagement party."

In February 2017, appellant and respondent had their immigration interview.  They were told to bring pictures, so they brought in pictures from their engagement party and led the interviewer to believe it was their wedding.  After the interview, respondent's family continued to press appellant's family on a date for the religious ceremony, but appellant now wanted to wait until he had a job.

In March 2017, appellant got a job at Macy's, and later, his green card, and the families continued to discuss the religious ceremony.  Appellant and his family, however,

had further excuses for putting it off.  Appellant did not have a car; respondent's father gave him one.  He also took appellant to get his driving test.  Appellant could not pass the eye exam because he needed glasses; respondent's father took him to the eye doctor and bought him glasses.  Appellant was then able to pass the test, but respondent's father felt appellant was "delaying."  Appellant now had a green card, a job, and a car.  But there was still no date set for the religious wedding.

Prior to their civil ceremony, respondent described her relationship with appellant as "nice."  After the ceremony, appellant began to show a lack of interest.  Respondent texted appellant with her concerns, but nothing changed.  Respondent and appellant were not sexually intimate.  Respondent and her father noticed a distinct lack of affection from appellant toward respondent.

In July 2017, respondent and appellant were arguing, their families were arguing, and respondent (along with her father) issued an ultimatum.  Respondent gave appellant one month:  " 'We should be married.  I need to have a religious ceremony.  I need your family to be involved in the plan.' "  Respondent's father wanted appellant to move out of his family's home and get an apartment; he offered to help.

Respondent's father expected to hear back from appellant but after a month of silence, he called appellant's father.  He asked appellant's father if they had chosen a date for the religious wedding.  They had not, appellant's father said, they were waiting for appellant's brothers to finish school in London, which would be in another eight months.  Appellant's mother said she would call back in three days; she did not, but appellant did.

Appellant called respondent's father.  Her father expected appellant to be calling with a date for the wedding.  Instead, appellant called off the "relationship."

In August 2017, respondent filed a petition for nullity of her marriage to appellant.  In her petition, appellant alleged fraud.  Specifically, she claimed appellant promised her that if she married him in a civil ceremony so he could obtain a green card, he would then

3

marry her in a religious ceremony. Appellant, however, had no intention of keeping that promise.

Following trial, the trial court ruled "[t]he evidence in this case is more than sufficient to support a determination that [appellant's] objective in marrying [respondent] was to acquire a green card and that he made promises solely to induce her to have a civil ceremony without any intention of fulfilling his promise once the underlying purpose had been accomplished. [Respondent] did not discover the fraud until after the civil ceremony when [appellant] made it clear that he was not going forward with the promised religious ceremony." Accordingly, the trial court granted respondent's request for a judgment of nullity on the basis of fraud.

Appellant subsequently filed a motion to vacate the judgment and enter a new judgment, or alternatively, to grant a new trial. The trial court denied appellant's motion in its entirety. Defendant appeals from this order as well as the judgment.

## II. DISCUSSION

A marriage may be judged a nullity if "[t]he consent of either party was obtained by fraud, unless the party whose consent was obtained by fraud afterwards, with full knowledge of the facts constituting the fraud, freely cohabited with the other as his or her spouse." (Fam. Code, § 2210, subd. (d).) Immigration fraud like that alleged here will support an annulment. (E.g., *In re Marriage of Liu* (1987) 197 Cal.App.3d 143, 155-156 (*Liu*); *In re Marriage of Rabie* (1974) 40 Cal.App.3d 917, 921-922.) The existence of actual fraud is a question of fact (Civ. Code, § 1574), and the testimony of one witness entitled to credibility is sufficient to prove any fact (Evid. Code, § 411).

Accordingly, we review judgments of annulment for substantial evidence. (*Liu*, *supra*, 197 Cal.App.3d at pp. 155-156; *In re Marriage of Rabie*, *supra*, 40 Cal.App.3d at p. 921; *Lamberti v. Lamberti* (1969) 272 Cal.App.2d 482, 485-486.) We are bound by the trial court's interpretation of the facts and view the facts in the light most favorable to respondent as the prevailing party below. (*Liu, supra*, at pp. 155-156.)

4

A judgment of annulment based on immigration fraud was upheld by the court of appeal in *Liu*, *supra*, 197 Cal.App.3d 143. In that case, the husband testified the parties married in both civil and traditional ceremonies in Taiwan. (*Id.* at p. 147.) He returned to the United States, and the wife asked him to apply for a green card so she could enter and remain in the United States. (*Id.* at pp. 147-148.) He did so, but the parties separated within two months after the wife came to the United States, and the husband testified they never had sexual relations. (*Id.* at p. 148.)

The trial court in *Liu* found "the marriage was never consummated, that [the wife] entered into the marriage for the purpose of obtaining a 'green card,' that she did not intend to engage in sexual relations or to perform her marital duties, and that the parties never cohabited as husband and wife. Consequently, the court found that [the husband's] consent to marry was obtained by fraud within the meaning of [former] Civil Code section 4425, subdivision (d)." (*Liu*, *supra*, 197 Cal.App.3d at p. 148.) The court of appeal found substantial evidence to support the trial court's conclusions because: (1) husband testified he never had sexual relations with his wife; (2) there was evidence of the wife's ulterior motive, i.e., to obtain a green card to allow her to reside in the United States; and (3) the marriage deteriorated rapidly as soon as the wife arrived in the United States. (*Id.* at p. 156.)

In *Lamberti v. Lamberti*, *supra*, 272 Cal.App.2d 482, a man who was in the United States as a visitor married a United States citizen in a civil ceremony to avoid deportation. (*Id.* at p. 483.) The parties agreed they would also marry in a religious ceremony, but once his immigration problems were resolved, the husband refused to complete the religious ceremony, and the marriage was never consummated. (*Id.* at pp. 483-484.) Upholding the trial court's grant of the wife's annulment petition, the appellate court opined that an annulment is proper "where one prospective spouse, in order to induce the other to enter into a civil marriage, makes a promise of a subsequent religious ceremony without intending to keep it . . . ." (*Id.* at p. 485.) "In order to

5

determine what constitutes sufficient fraud to annul a marriage there must be regard for the whole status of both parties and the circumstances which induced the contract—in short, the fraud must be determined by the circumstances of each case. We think it necessarily follows that an annulment of an unconsummated marriage may be secured more readily than one in a situation where the parties have cohabited as husband and wife." (*Ibid*.)

There is ample evidence in the record to support the trial court's finding that respondent's consent to the marriage was obtained by fraud, because appellant entered into the civil marriage only for the purposes of obtaining permanent residency in the United States and had no intention of following through with his promise for a religious wedding.

It is undisputed the parties never lived together, and their marriage was never consummated. As such, the parties "never cohabitated as husband and wife." (See *Liu*, *supra*, 197 Cal.App.3d at p. 148.) It was appellant's inaction in securing a date for the religious wedding after his immigration problems were resolved that ensured the marriage would never be consummated. (See *Lamberti v. Lamberti*, *supra*, 272 Cal.App.2d at p. 484.) The court could properly have inferred appellant never intended to cohabitate with respondent, and thus his only intent in solemnizing the marriage was to gain permanent residency.

## III. DISPOSITION

The judgment is affirmed. Samreen Salehi shall recover her costs on appeal, if any. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

6

/S/

_____

RENNER, J.

We concur:

/S/

_____

RAYE, P. J.

/S/

_____

DUARTE, J.